FILED
06/01/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2020

**STATE OF TENNESSEE v. JONATHAN MONTGOMERY**

**Appeal from the Circuit Court for Rutherford County**
**No. F-77199   David M. Bragg, Judge**

_____

**No. M2019-00757-CCA-R3-CD**

_____

The Defendant-Appellant, Jonathan Montgomery, was convicted by a Rutherford County jury of initiating a false report in violation of Tennessee Code Annotated section 39-16-502, a Class D felony.  As a Range I standard offender, the Defendant received a sentence of three years imprisonment to be served at thirty (30) percent release eligibility. In this appeal as of right, the sole issues presented for our review are (1) whether the evidence is sufficient to sustain the Defendant's conviction, and (2) whether the trial court abused its discretion in denying the Defendant's request for an alternative sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Gerald L. Melton, District Public Defender, and Billie I. Zimmermann, Assistant Public Defender, for the Defendant-Appellant, Jonathan Montgomery.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah Davis, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In the early morning hours of August 21, 2016, the Defendant returned to his residential hotel room with "Diana," a woman he had met earlier that night at the Coconut Bay Café.  He went to the restroom, and when he came out, he noticed that his wallet and two rings were missing.  He ran out of the hotel and purportedly chased the individuals involved, but he was unsuccessful.  In the process, he became locked out of

the hotel and asked the hotel clerk for a replacement key. Based on the hotel policy, the clerk could not replace the key until she called the police and filed a report. When the clerk called 911, she gave the phone to the Defendant, who advised 911 dispatchers that he had been robbed by individuals with knives. Upon police arrival, the Defendant reported to Murfreesboro Police Department (MPD) Officer James Wilkinson and Sergeant Marja Atchley that he had been robbed by the woman, who had been aided by two African American men. During the course of the investigation, the Defendant provided multiple versions of the events and numerous inconsistent statements. When responding officers found the items that had been reported missing in the Defendant's hotel room and his pants pocket, the Defendant was arrested for making a false report. The following proof was adduced at the Defendant's November 27, 2018 jury trial.

Officer Wilkinson testified that he responded to the aggravated robbery call in this case around two o'clock in the morning. He spoke with the Defendant who was intoxicated and unsteady on his feet. The Defendant advised Officer Wilkinson that he had met an African-American female at the Coconut Bay Café earlier that night, they returned to his hotel room, and he began to make some food. The Defendant further advised that the woman was texting on her phone, opened the door, and allowed two African American males inside. The Defendant said that the woman took his ring and ran out the door. When the Defendant attempted to follow her, the two men pushed him back into the room. The Defendant then put his shoes on and chased them out of the parking lot. The Defendant initially told Officer Wilkinson that two of his rings were stolen, and he later reported that his wallet was also taken. Officer Wilkinson stated that the Defendant initially told him that the two African-American men did not come into his room. However, when asked if the woman went outside to let the men in, the Defendant said that she did not.

Officer Wilkinson explained there were only two methods to gain entry into the hotel after hours: with a key or by being buzzed inside by the hotel clerk. The Defendant's initial statement that the two men entered the hotel without a key did not make sense to Officer Wilkinson, unless the two men were residents of the hotel. The Defendant also initially told Officer Wilkinson that he chased the men out the front door to the parking lot. The Defendant provided a description of the car they drove as a "white, two door car." However, the Defendant later said that he did not actually see the men get into a car or leave the parking lot. Based on these inconsistencies, Officer Wilkinson opined that the Defendant could not provide officers with a description of the car because he had not seen one. During the investigation, Officer Wilkerson personally stopped a car matching the initial description given by the Defendant, but the occupants were released because they did not match the description.

Officer Wilkinson asked the Defendant to clarify how the two males got inside his room.  The Defendant told him that "the female must have somehow let them in, either by getting a key or going to let them in."  The Defendant then provided a second variation of the offense and explained as follows:

> [T]hey came into his room, and they all sat down and drank beer, smoked marijuana, and played PlayStation.  And he said at that point, they got up, took his rings, and left.  No force involved.  Just they were on the table and they picked them up and left.

Although the Defendant advised 911 dispatch that knives were involved, he did not include this fact in his statement to Officer Wilkinson.  The Defendant told Officer Wilkinson that he did not know these men, but he believed that the woman knew them.  In yet a third variation of the offense, the Defendant told Officer Wilkinson that "the males then wanted him to go and withdraw money from the ATM in the lobby.  And, so, he claimed that he was playing opossum and went along with it, and he went down with the female to attempt to draw money from the ATM."  The Defendant then explained that he attempted to comply with their request and went to the hotel ATM, knowing that he would be unable to withdraw the requested amount because it was after hours.  Upon returning to the room, the two men were upset, took his rings and wallet, and "they all left."  Officer Wilkinson testified that the ATM and the elevator were within view of the front desk where the hotel clerk could see them.

Officer Wilkinson went to the Defendant's room and observed food on the counter and a couple of beer cans.  He stated that the Defendant's rings were recovered prior to him entering the room.  Officer Wilkinson noticed that there appeared to be something in the Defendant's front pocket.  He asked the Defendant to take it out, and the Defendant said it was his wallet and that he saw it on his bed when he went back into his room before speaking to police.  The Defendant did not tell the officers because "he didn't want [them] to think that he was lying about what happened."  Officer Wilkinson stated that he was never able to confirm that two African American males came into the Defendant's room around that time.  He confronted the Defendant about the inconsistences in his version of the offense, and each time the Defendant "add[ed] something extra to the story and change it even more."  The Defendant could not explain how his property was recovered, and Officer Wilkinson determined that no crime had occurred.  He charged the Defendant with filing a false report "based on the numerous inconsistencies with his stories and due to the fact that [the Defendant] . . . knowingly lied about an element of the crime that he was reporting, which was the wallet being stolen."

On cross-examination, Officer Wilkinson confirmed that the Defendant mentioned that the white car was a Honda or a Toyota. He stated that the Defendant initially reported that two of his rings were stolen; however, Officer Wilkinson did not conduct an inventory search of the Defendant's room to determine if the rings were still in place. Officer Wilkinson stated that he did not smell marijuana in the Defendant's room, and he did not see any alcoholic drinks other than the empty beer cans. Officer Wilkinson also stated that someone could enter a side door of the hotel if a door was propped open. He agreed that it was possible that the hotel clerk could be out of sight of the ATM and the elevator if he or she was working in the back hallway. Officer Wilkinson was unaware if the Defendant was able to conduct an inventory search of his hotel room before the police arrived, but he said the Defendant was out of his range of view for a couple of minutes when he arrived at the hotel. He could not recall whether the Defendant was wearing shoes when he arrived. Officer Wilkinson suspected that the woman who came to the Defendant's hotel room was a prostitute.

On redirect examination, Officer Wilkinson stated that he gave the Defendant "multiple opportunities to tell [them] what really happened, tell [them] it wasn't an armed robbery, tell [them] it was just a theft." He said the Defendant "stuck to his original claims that he was robbed." Officer Wilkinson stated that the parking lot of the hotel was set up so that someone could not turn left out of the front of the parking lot. He did not get video surveillance from the hotel because they "had enough to determine that he was filing a false report."

The testimony of MPD Sergeant Marja Atchley largely mirrored the testimony of Officer Wilkinson in relation to the Defendant's variations of the offense and inconsistent statements. Additionally, Sergeant Atchley found a ring and condoms in an open drawer in the Defendant's bedroom and a condom "that [was] open" as if "someone was about to use [it] but obviously got interrupted" in the bathroom. Sergeant Atchley also confirmed that the Defendant pulled his wallet from his front pocket during the investigation. She said the Defendant told her that he saw it on his bed when the police initially responded to his hotel room and put it in his pocket. Upon confirming that the wallet contained the Defendant's personal information, including his driver's license and credit cards, the Defendant was advised of his Miranda rights.

At this point, Sergeant Atchley urged the Defendant to come forward with the truth, and she explained as follows:

> I said, if you got -- I said, if she stole cash like off of your counter, a theft of services -- I said, did you offer her money for sex. I said, was there an agreement that when you came -- you brought her back that you all were

- 4 -

going to have consensual intercourse between two adults and then she decided, no, I don't want to?

I said, that's fine. I said, we can cut our losses. I said, we can do a report for the theft. I said, and we can note -- I said, because if she is actually someone that comes home with males and she is, let's say, a prostitute, and she's just using you or she's setting you up, I said, I can document this, we can pass this on, okay. Because we do have a lot of calls that end up like this in our police department.

In response, the Defendant was silent and "just sat there." Sergeant Atchley said the Defendant talked about another variation of events that involved everyone smoking marijuana, sitting around drinking, and playing video games. However, she did not observe the smell of marijuana in the hotel room. Sergeant Atchley said that she had enough evidence to possibly confirm an assault or a theft but not a robbery. She said "the only crime that was committed is he provided false information."

On cross-examination, Sergeant Atchley stated that she and Officer Wilkinson spoke to the Defendant separately in the hotel lobby. She also spoke to the hotel clerk, and she confirmed that a clerk would not be able to see the ATM or the front door if he or she was sitting in the alcove. Sergeant Atchley affirmed that the hotel clerk made the 911 call, but the Defendant was on the recording. She did not know who "initiate[d]" the phone call or who dialed the phone. Sergeant Atchley stated that "there [were] multiple units tied up on this one call looking for this suspect vehicle." She also stated that she walked around the hotel premises and all of the exterior doors were locked. She was not aware if these exterior doors had alarms. Sergeant Atchley said that the ring in the bedside drawer appeared to be a gold nugget ring. She did not take any photographs of the Defendant's room, his wallet, or his rings. Sergeant Atchley said that the Defendant never specifically said that he was assaulted, and he never used the specific words "aggravated robbery."

On redirect examination, Sergeant Atchley said that the Defendant never said anything to her about knives being used against him. It was her understanding that the Defendant was initiating a report by calling the police and speaking to her. On re-cross examination, the State played the 911 call made in this case. The hotel clerk stated that a resident at the hotel reported that he had been robbed. The Defendant then told the dispatcher that he met an African-American woman at the Coconut Bay Café, and they went back to his hotel room. He said that the woman kept texting, which he thought was suspicious. He stated that a couple of males came into his room and stole his wallet, his rings, and his car keys. When asked if these people had any weapons, the Defendant said they had knives and fists. He said that he tried to chase them barefooted, and they left in

a white car out front. He also stated that he asked the front desk clerk if "their camera hit the ATM" because he was somewhat forced to withdraw money. He confirmed that he had to be let back inside the hotel. He said that one of the African-American men was wearing an orange jumpsuit, and the other was wearing a white t-shirt. He said that the people turned left out of the hotel. The Defendant introduced this call into evidence.

The Defendant testified that, on the night of the offense, he knocked on the front door of the hotel because he did not have his key. The hotel clerk let him inside and told him that she could not give him another key until she called 911. He said the clerk gave him the key "about the time the police officers arrived." The Defendant stated that he was at the Coconut Bay Café earlier that night to watch a UFC fight, and he went back to his hotel room with a woman he met named Diane. He said it was possible that he was going to have sex with this woman, but he was not going to pay her for her services. The Defendant drove himself and the woman back to the hotel. He stated that he had two hotel keys at that time.

When the Defendant arrived at his hotel room, he put his "wallet, keys, everything in that drawer beside the bed." The Defendant was staying at the hotel because he lost his home in a house fire, and his insurance company paid for him to stay there. He had two rings in the room- a titanium ring with diamonds and a gold nugget ring. He said that he only had the gold nugget ring, because the other ring was stolen. When he and the woman from the Coconut Bay Café got back to his room, they talked about going to McDonald's or Waffle House, but the Defendant "really didn't want to go back out." He said the woman "coerced" him to go to the lobby to withdraw money from the ATM. He stated that the woman went with him to the ATM, and the hotel clerk was not at the front desk at the time. He also stated that the two men were not involved at that time, and he never told the police that the men forced him to go to the ATM. The Defendant put the receipt from the ATM transaction in his wallet and later showed it to the police. When they got back to his hotel room, the Defendant began making sandwich wraps, while the woman was watching TV and texting, which the Defendant thought was suspicious. The Defendant went to the bathroom, and, when he came out, the drawer where he kept his wallet and rings was open. He ran out of his room barefoot, and his door shut and locked behind him. He ran down the back stairwell, and he saw "them" getting into a car on the back side of the hotel. The Defendant said that he had noticed the door to the smoking deck propped open previously. Because the Defendant locked his hotel key in his room, he had to walk to the front of the hotel and ask to be let inside. He explained to the hotel clerk that someone had come into his room and stolen his rings and wallet, and he needed a key to get back into his room. The clerk told him that it was hotel policy to call 911, which she did.

The Defendant testified that he had not planned to call the police because he "didn't think there was anything [anyone] could do." Although the clerk gave him a key,

he was unable to return to his hotel room to check if his belongings were missing before the police arrived. He assumed that his possessions were missing because the bedside table drawer was open. The Defendant stated that he also went to the front desk to ask for a copy of the ATM camera surveillance to show that he was there with the woman. The Defendant did not intend to mislead the police. The officers questioned him in the lobby, and then they went to his room. Upon return, he saw one of his rings in the bedside table drawer and his wallet on the bed, which he picked up and put in his pocket. He said his titanium ring was still missing.

The Defendant heard one of the officers say "this is a prostitution thing[,]" and he "already felt like [he] was being convicted before [they] even went upstairs." He assumed that the men came into his room to help the woman and to drive her because she did not have a car at the hotel. He also thought that he smelled marijuana in the hallway and in his room, so he believed that these men had it on them. He said that he never invited the men into his room, and he only talked about playing video games with the woman. He did not know where the statement to police that he was hanging out in his room with the men playing video games came from.

The Defendant said that Sergeant Atchley asked him personal questions, but she did not ask him about the woman or about prostitution. He said that he was drinking that night, but he was not intoxicated. The Defendant said that his statements to the police were true to the "best of his knowledge[,]" although he assumed that his rings and wallet were missing because the bedside table drawer was open. He did not remember telling the police that his car keys were stolen.

On cross-examination, the Defendant said that he had two to three beers while he was at the Coconut Bay Café. He met the woman about 30 minutes before he left, but they did not talk about exchanging money for her services. He told her that they could eat and drink tequila at his hotel room. The Defendant believed that he had two hotel keys before they entered his room. He stated that he did not take any money from the ATM because it would not let him take money out. He did not say anything to the hotel clerk because he did not want to go out to eat. The Defendant confirmed that he "played opossum" by acting like he did not have any money. The Defendant did not believe that the officers did not see the bottle of tequila in his room. He also denied that there was an open condom in the bathroom, and he did not remember Sergeant Atchley ever going into the bathroom. He believed that she only saw the condoms in the drawer. The Defendant said that, after he chased the woman out of the hotel, he saw her and a man getting into a white car, and another man was driving the car. He said the man getting into the car was wearing an orange jumpsuit, but he could not describe the male driver. However, he acknowledged that he told the police that these men were both African-American, and he asserted that this was the truth.

The Defendant denied telling the police that the two men shoved him back into his room. He believed that one of the men was blocking the exit door, preventing him from going through the door. He said that he told the police that he thought that the men came into his room. He believed that the officers were confused about who he said he was playing video games with in his room. He denied telling the police that he was smoking marijuana but instead told them that he smelled it, which he believed confused the officers. The Defendant said he was "telling the story real fast" to the police, and he "didn't go into all the details." He said the woman pulled a knife out of her purse when he said he needed something to open the plastic to make the sandwich wraps. He said neither of the men hit him. He believed that the police "got it mixed up" and "already had [him] judged as a prostitute thing gone bad." He wanted the ATM surveillance so he could have proof that he had been robbed. The Defendant said that Sergeant Atchley saw one of his rings in the bedside table drawer, and he said that he volunteered the information that he had found his wallet. He did not recall Officer Wilkinson asking him to take his wallet out of his pocket. He also did not remember Sergeant Atchley telling him that she could file a report for theft of services. On redirect examination, the Defendant said that he did not initiate the call to the police or ask the hotel clerk to call the police, but he felt obligated to talk to the police once they arrived. Following this proof, the Defendant rested.

The State recalled Sergeant Atchley on rebuttal, and the State introduced Officer Wilkinson's dash camera audio and video. Sergeant Atchley explained that the patrol car was parked in front of the hotel, but the audio captured the officers' conversations with the Defendant. The Defendant told Officer Wilkinson that he brought the woman to his hotel from the Coconut Bay Café. He said her friend also came with them, but he did not invite the two men. He described the car as a white Nissan or Toyota. He said he thought it was "fishy" that the woman kept using her phone. He said he was making a sandwich wrap, and the woman "jetted out." He stated that the men stopped him at the door and pushed him back inside and then ran off. He said that the men and the woman took two rings from him. The Defendant next told officers that the woman let the two men into the room. He also said that the men tried to force him to withdraw money. The Defendant said that he was drinking tequila with the woman, and she left, saying she had to talk to a friend. He continued, saying that the men came in his room, and he chased them, barefooted, out of the hotel. Later, the Defendant said that he tried to play opossum when the men asked him to withdraw two-hundred dollars, because he knew that he did not have that much money. Sergeant Atchley then stated that the Defendant told her that they were smoking marijuana in the Defendant's room. She said that the Defendant gave her multiple, conflicting stories. The dash camera footage also showed the traffic stop conducted by Officer Wilkinson. Following deliberations, the jury convicted the Defendant as charged.

**Sentencing.** The trial court held a sentencing hearing on March 1, 2019. The State entered the Defendant's presentence report as an exhibit to the hearing. Larry Montgomery, the Defendant's father, testified that the Defendant had a nursing degree and worked as a nurse until a couple years prior to the Defendant's sentencing hearing. He stated that the Defendant had completed rehabilitation at Buffalo Valley, and the Defendant wore an alcohol detecting device on his ankle. He knew that the Defendant's bond was revoked because he did not charge this device. Larry Montgomery also explained an instance where the Defendant was abducted by men who he met who were interested in purchasing a piece of his property. The police became involved, and the men were charged with aggravated kidnapping. Larry Montgomery stated that the Defendant was paranoid, "probably to the point of even being delusional sometimes." He said the Defendant told him that he did not feel threatened when he was in prison. He also said that the Defendant had received an offer for time served prior to the sentencing hearing. Larry Montgomery stated that the Defendant would live with him if he was released on time served. He did not believe that the Defendant could get a job as a nurse, however. Larry Montgomery did not believe that the Defendant was a threat to society, and he thought he was open to rehabilitation. He stated that the Defendant was clinically depressed.

On cross-examination, Larry Montgomery affirmed that the Defendant had been to rehab three times at the Samaritan House, four times at the V.A., and one time at Buffalo Valley. He said that he believed that the Defendant wanted to change this time. He was aware that his son was still licensed as a nurse, although he did not know how this was possible. He was aware of some, but not all, of the Defendant's DUI convictions. He suspected that the Defendant did not comply with the requirements at Buffalo Valley, but he did not find out the details until the Defendant's bond hearing. He agreed that the story about the Defendant being kidnapped sounded strange, but he believed that it was true. The trial court sentenced the Defendant to three years imprisonment.

On April 23, 2019, the trial court conducted a hearing on the Defendant's motion for new trial, which was denied. The Defendant filed a timely notice of appeal, and his case is now properly before this Court for our review.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends that the evidence is insufficient to sustain his conviction for false report. Because the hotel clerk made the 911 call pursuant to hotel policy, the Defendant argues that he did not initiate the police report as required by the false reporting statute. He also insists that portions of his statements did not change and were proven to be true. Finally, he contends that he did

- 9 -

not have an opportunity to check his room in between the time the woman left and the police arrival to ensure which of his belongings were missing. In response, the State contends that the evidence is sufficient to sustain the Defendant's conviction of false report. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Tennessee Code Annotated § 39-16-502(a)(1) defines false report as follows:

(a) It is unlawful for any person to:

(1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

(A) The offense or incident reported did not occur;

(B) The person has no information relating to the offense or incident reported; or

(C) The information relating to the offense reported is false[.]

Viewing the evidence in the light most favorable to the State, the hotel clerk called 911 after the Defendant told her that he was robbed and needed a key to get back into his room. Although the Defendant argues that he did not "initiate" the call by physically dialing the phone, the Defendant told the hotel clerk and the 911 dispatcher that he had been robbed. When Officer Wilkinson and Sergeant Atchley arrived, the Defendant gave multiple statements to each of them concerning the alleged robbery. Officer Wilkinson and Sergeant Atchley testified that the Defendant provided multiple versions of the events that occurred that night and constantly changed his story. The officers' testimony was corroborated by the 911 call and Officer Wilkinson's dash camera footage. The Defendant initially told officers that two rings and his wallet were stolen; however, one of the rings was found in the bedside table drawer, and the Defendant found his wallet on the bed. The Defendant argues that he did not know that this information was false because he did not have an opportunity to check his room in between the time the woman left and police arrival to ensure which of his belongings were missing. However, Officer Wilkinson and Sergeant Atchley gave the Defendant multiple opportunities, even after they discovered these items, to tell them what actually occurred, and he maintained that he had been robbed. The jury, as was its prerogative, accredited the testimony of Officer Wilkinson and Sergeant Atchley. State v. Thompson, 36 S.W.3d 102, 107 (Tenn. Crim. App. 2000); State v. Stephens, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007). Accordingly, the evidence is sufficient to support the Defendant's conviction of false reporting, and he is not entitled to relief on this claim.

**II. Sentencing.** Next, the Defendant contends the trial court abused its discretion in denying his request for a suspended sentence or split confinement. Because he was not convicted of a crime of violence and the instant crime did not involve actual victims, the Defendant argues he was entitled to an alternative sentence. In response, the State contends that the trial court properly exercised its discretion in denying the Defendant's request for probation or an alternative sentence. We agree with the State.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the

- 11 -

purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (citing State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012)).  Any sentence that does not involve complete confinement is an alternative sentence.  See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001).  Appellate courts should affirm a sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10.  The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

> Trial courts are required to consider the following when imposing a sentence:
>
> (1) The evidence, if any, received at trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
>
> (7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and
>
> (8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). Moreover, Tennessee Code Annotated section 40-35-102(5) provides trial courts with guidance regarding the type of defendant who should be required to serve their sentences in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving

incarceration[.]

In addition, trial courts should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

As a Range I, standard offender convicted of a Class D felony, the Defendant was subject to a penalty of not less than two years nor more than four years imprisonment. Tenn. Code Ann. § 40-35-105, -112(4). Accordingly, the Defendant's three-year sentence fell within the applicable sentencing range and is presumed reasonable. In challenging his sentence on appeal, the Defendant does not specify how the trial court abused its discretion in imposing sentence. Instead, he posits that he is entitled to alternative sentencing or split confinement based on the record "taken as a whole" and the non-violent nature of the offense. Our review of the record shows that the trial court engaged in an extensive hearing, during which it carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing. Based on the statute, the trial court acknowledged that the Defendant should be considered a favorable candidate for alternative sentencing. See Tenn. Code Ann. §40-35-102(6)(A) (providing that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" The trial court noted however that the Defendant had failed to comply with conditions of release in relation to his multiple convictions of DUI. The Defendant also failed to comply with his conditions of release, and the trial court revoked his bond during the pendency of this case. The trial court further noted its concern "over someone who would make a report that was somewhat fantastical, and even after trial continued to assert that his recounting of the events was accurate and every other piece of proof was wrong."

The record reflects that the trial court considered the factors set forth in Tennessee Code Annotated §§ 40-35-102 and 40-35-103. Because the Defendant has failed to demonstrate an abuse of discretion, denial of an alternative sentence was proper. He is not entitled to relief.

## CONCLUSION

Based on the above authority and reasoning, we affirm the judgment of the trial court.

_____

CAMILLE R. MCMULLEN, JUDGE